No. 2025-1572

# United States Court of Appeals
# for the Federal Circuit

BT AMERICAS, INC.,

*Appellant*

*v.*

PALO ALTO NETWORKS, INC.,

*Appellee.*

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2023-00889

**PALO ALTO NETWORKS' RESPONSE BRIEF**

William H. Milliken
Michael D. Specht
Daniel S. Block
Jonathan Tuminaro
Steven M. Pappas
STERNE KESSLER GOLDSTEIN & FOX PLLC
1101 K Street, NW
Floor 10
Washington, DC 20005
(202) 371-2600

*Counsel for Appellee*
*Palo Alto Networks, Inc.*

October 8, 2025

# PATENT CLAIMS

## U.S. Patent No. 7,895,641

1. A system for operating a probe as part of a security monitoring system for a computer network, the system comprising:

   a) a sensor coupled to collect status data from at least one monitored component of the network;

   b) a filtering subsystem coupled to analyze status data to identify potentially security-related events represented in the status data, wherein the analysis includes filtering followed by an analysis of post-filtering residue, wherein the post-filtering residue is data neither discarded nor selected by filtering;

   c) a communications system coupled to transmit information about the identified events to an analyst system associated with the security monitoring system;

   d) a receiver for receiving feedback at the probe based on empirically-derived information reflecting operation of the security monitoring system; and

   e) a modification control system for dynamically modifying an analysis capability of the probe during operation thereof based on the received feedback.

Appx180(33:26–45).

2. The system of claim 1, wherein the identifying step includes performing a multi-stage analysis of the status data.

Appx180(33:46–47).

6. The system of claim 2, wherein the multi-stage analysis includes analysis at the probe and analysis at a secure operations center configured to receive data from the probe.

Appx180(33:55–57).

18. A method of operating a secure operations center as part of a security monitoring system for a customer computer network, comprising:

creating an event record for information received about an identified potentially security-related event occurring on the network, wherein the potentially security-related event is identified by filtering followed by an analysis of postfiltering residue, wherein the post-filtering residue is neither discarded nor selected by the filtering;

correlating the event record with customer information and a symptom record;

using the correlated symptom record to link the event record to problem resolution information;

consolidating the event record, correlated customer information and symptom record, and linked problem resolution assistance information into a problem ticket; and

providing the problem ticket to a security analyst console for analysis.

Appx180(34:22–39).

**FORM 9. Certificate of Interest**

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2025-1572

**Short Case Caption** BT Americas, Inc. v. Palo Alto Networks, Inc.

**Filing Party/Entity** Palo Alto Networks, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/04/2025

Signature: /s/ William H. Milliken

Name: William H. Milliken

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Palo Alto Networks, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable              ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable              ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES .................................................................. vi

INTRODUCTION ............................................................................................. 1

STATEMENT OF THE ISSUES ....................................................................... 2

STATEMENT OF THE CASE .......................................................................... 3

I.   THE '641 PATENT ................................................................................. 3

     A.   The specification and claims ..................................................... 3

     B.   Prosecution history and previous IPR challenge ...................... 7

II.  THE PRIOR ART ................................................................................... 8

     A.   Duvall's filtering system ........................................................... 8

     B.   Chu's human-intervention techniques ...................................... 11

III. THE PROCEEDINGS BELOW ................................................................. 12

     A.   The Board finds the "dynamically modifying" limitation of
          independent claim 1 obvious. ................................................... 12

     B.   The Board finds that a skilled artisan would have been motivated
          to combine Duvall and Chu. ..................................................... 16

     C.   The Board finds the "multi-stage analysis" of claim 6 obvious. ........ 20

SUMMARY OF THE ARGUMENT ................................................................ 23

STANDARD OF REVIEW .............................................................................. 28

ARGUMENT .................................................................................................. 29

I.   THE BOARD DID NOT ERR IN FINDING THE "DYNAMICALLY MODIFYING"
     LIMITATION OF CLAIM 1 OBVIOUS. ...................................................... 29

     A.   BTA's arguments do not apply to claims 18–25 ....................... 29

     B.   The Board correctly determined that the combination of Duvall
          and Chu teaches the claimed dynamic modification. ............... 29

     C.   BTA's arguments ignore the factual record and the Board's
          detailed analysis. .................................................................... 32

          1.   The Board correctly tied Duvall's analysis capability to
               modification of filters in Duvall's filter database. ............. 32

          2.   BTA's "cache coherency" argument is both forfeited and
               meritless. ...................................................................... 33

i

3.     BTA mischaracterizes the Board's reliance on *ParkerVision*. ...........................................................38

II.    THE BOARD DID NOT ERR IN FINDING A MOTIVATION TO COMBINE. ...............42

A.    The Board correctly determined that a skilled artisan would have combined Duvall and Chu. ...................................................42

B.    BTA's contrary arguments fail. ...........................................44

1.     PAN did not change its proposed motivation to combine Duvall and Chu. ..........................................................44

2.     BTA's contention that Chu's human intervention is "antithetical" to Duvall amounts to an improper bodily incorporation argument. ......................................47

3.     The Board was entitled to consider evidence of the state of the art in determining obviousness. ......................49

4.     The Board did not use improper hindsight. ....................51

5.     The system of Duvall-Chu is not rendered inoperable based on the volume of data sent to a human analyst. ......................53

III.   THE BOARD DID NOT ERR IN FINDING CLAIM 6 OBVIOUS. ..............55

IV.   THE BOARD DID NOT LACK JURISDICTION OVER THE '641 PATENT ................59

CONCLUSION .......................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) .........................................................47

*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*,
  825 F.3d 1373 (Fed. Cir. 2016) .........................................................48

*Apple Inc. v. Gesture Technology Partners, LLC*,
  127 F.4th 364 (Fed. Cir. 2025) ....................................................27, 59

*Axonics, Inc. v. Medtronic, Inc.*,
  73 F.4th 950 (Fed. Cir. 2023) .....................................................49, 54

*In re Baxter*,
  678 F.3d 1357 (Fed. Cir. 2012) .........................................................52

*Cablz, Inc. v. Chums, Inc.*,
  708 F. App'x 1006 (Fed. Cir. 2017) ..................................................34

*Consolidated Edison Co. of New York v. NLRB*,
  305 U.S. 197 (1938).............................................................................28

*Dell Inc. v. Acceleron, LLC*,
  884 F.3d 1364 (Fed. Cir. 2018) .........................................................34

*Elbit Systems of America, LLC v. Thales Visionix, Inc.*,
  881 F.3d 1354 (Fed. Cir. 2018) .........................................................28

*Eli Lilly & Co. v. Teva Pharmaceuticals International GmbH*,
  8 F.4th 1331 (Fed. Cir. 2021) ............................................................40

*Ericsson, Inc. v. D-Link Systems, Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ....................................................40, 41

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) .........................................................41

*Intel Corp. v. PACT XPP Schweiz AG*,
 61 F.4th 1373 (Fed. Cir. 2023) .......................................................46

*Intel Corp. v. Qualcomm Inc.*,
 21 F.4th 784 (Fed. Cir. 2021) .........................................................49

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
 256 F.3d 1323 (Fed. Cir. 2001) .....................................................56

*INVT SPE LLC v. ITC*,
 46 F.4th 1361 (Fed. Cir. 2022) ..................................................40, 41

*Kaneka Corp. v. Xiamen Kingdomway Group Co.*,
 790 F.3d 1298 (Fed. Cir. 2015) .....................................................56

*KSR International Co. v. Teleflex Inc.*,
 550 U.S. 398 (2007).................................................................49, 51

*Medtronic, Inc. v. Teleflex Innovations S.à.r.l.*,
 69 F.4th 1341 (Fed. Cir. 2023) ..................................................48, 49

*Meiresonne v. Google, Inc.*,
 849 F.3d 1379 (Fed. Cir. 2017) .....................................................28

*Merck & Co. v. Biocraft Laboratories*,
 874 F.2d 804 (Fed. Cir. 1989) .......................................................35

*In re Mouttet*,
 686 F.3d 1322 (Fed. Cir. 2012) ..................................................48, 49

*ParkerVision, Inc. v. Qualcomm Inc.*,
 903 F.3d 1354 (Fed. Cir. 2018) ...................................25, 38, 39, 40

*Randall Mfg. v. Rea*,
 733 F.3d 1355 (Fed. Cir. 2013) .....................................................51

*Recor Medical, Inc. v. Medtronic Ireland Manufacturing Unlimited Co.*,
 2025 WL 944511 (Fed. Cir. Mar. 27, 2025)....................................35

*Roku, Inc. v. Universal Electronics, Inc.*,
 63 F.4th 1319 (Fed. Cir. 2023) .....................................................28

*Sage Products, LLC v. Stewart*,
  133 F.4th 1376 (Fed. Cir. 2025) ...................................................................28, 31

*Shockwave Medical, Inc. v. Cardiovascular Systems, Inc.*,
  142 F.4th 1371 (Fed. Cir. 2025) ...........................................................................51

*Shoes by Firebug LLC v. Stride Rite Children's Group, LLC*,
  962 F.3d 1362 (Fed. Cir. 2020) ............................................................................31

*Snap Inc. v. You Map, Inc.*,
  2025 WL 2793538 (Fed. Cir. Oct. 1, 2025) ........................................................46

*Trading Technologies International, Inc. v. IBG LLC*,
  921 F.3d 1378 (Fed. Cir. 2019) ....................................................................28, 60

*Uber Technologies, Inc. v. X One, Inc.*,
  957 F.3d 1334 (Fed. Cir. 2020) ....................................................................31, 35

*Versata Software, Inc. v. SAP America, Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013) ....................................................................40, 41

*Voice Tech Corp. v. Unified Patents, LLC*,
  110 F.4th 1331 (Fed. Cir. 2024) ...........................................................................28

**STATEMENT OF RELATED CASES**

There is no other appeal in or from the same proceeding that was previously before this or any other appellate court. The following case may be directly affected by this Court's decision: *British Telecommunications PLC and BT Americas, Inc. v. Palo Alto Networks, Inc.*, 1:22-cv-01538 (D. Del.).

# INTRODUCTION

This appeal arises from an IPR in which the Board found claims 1–25 of BTA's '641 patent unpatentable as obvious. The patent relates to network security methods that involve, among other things, a "probe" that identifies potential security-related events using filters and an "analyst system" that analyzes "post-filtering residue." While BTA attempts to frame some of its appellate arguments in legal terms, BTA in substance challenges three of the Board's factual findings:

- the prior art renders obvious the limitation of claims 1–17 requiring the probe's capabilities to be "dynamically modif[ied]" based on received feedback;

- a skilled artisan would have been motivated to combine Duvall (disclosing an internet filtering system with an editable database of filters) and Chu (disclosing an internet filtering system that requires human intervention to handle data not expressly blocked or allowed by the filters) to arrive at the claimed invention; and

- the prior art renders obvious the "multi-stage analysis" required by claim 6.

BTA does not and cannot surmount the substantial-evidence standard of review applicable to these factual issues. The Board's conclusions on all three points—comprehensively spelled out in a final written decision and decision on rehearing collectively spanning 150 pages—are supported by far more than substantial evidence. That evidence includes the prior art itself and the testimony of PAN's expert, whom the Board expressly credited.

BTA's arguments otherwise fail for numerous reasons, as explained in detail below. But three points bear mention at the outset. *First*, and most fundamentally, most of BTA's appeal brief asks this Court to reweigh the evidence and second-guess the Board's credibility determinations. That is improper under the applicable standard of review. *Second*, many of BTA's arguments depend on rewriting the claims to incorporate limitations from the specification. That is improper under basic principles of claim construction. *Third*, BTA's principal argument against the Duvall-Chu combination posits, in effect, that a skilled artisan would not have imported Chu's system wholesale into Duvall. That is improper under this Court's precedent: bodily incorporation is not the test for obviousness.

This Court should affirm.

## STATEMENT OF THE ISSUES

1.     Whether substantial evidence supports the Board's finding that the "dynamically modifying" limitation of claims 1–17 is obvious over Duvall and Chu, where (a) Duvall's filter database is—undisputedly—dynamically updated; and (b) substantial evidence supports the Board's finding that updating filters in Duvall's filter database results in dynamically updating the analysis capability of Duvall's probe.

2.     Whether substantial evidence supports the Board's finding that a skilled artisan would have been motivated to combine Duvall and Chu to arrive at

the claimed network monitoring system of claims 1–25, where (a) Duvall discloses that a user can edit filters in a corporate environment when the user believes the filtering system is filtering too much or too little; (b) Chu's techniques further Duvall's goal by transmitting unknown data for which there is no matching filter to a human for resolution; and (c) network-security services with trained analysts were well known in the art.

3.     Whether substantial evidence supports the Board's finding that claim 6 is obvious over Duvall and Chu, where (a) the Duvall-Chu system identifies potential security-related events by performing a multi-stage analysis of status data at both the probe and a secure operations center; and (b) following this analysis, the system transmits information associated with the identified events from the secure operations center back to the probe.

## STATEMENT OF THE CASE

## I.     THE '641 PATENT

### A.     The specification and claims

The issue addressed by the '641 patent is simple: network security system administrators "do not have the time or ability to read through large amounts of constantly updated audit information, looking for attacks on their systems." Appx164(1:36–39). Nor do they "have time to become experts on every kind of intrusion and to maintain that expertise." Appx164(1:41–42). The purported

solution to this problem is likewise simple: "employ[] human intelligence, us[ing] trained personnel" to sort through security-related information and implement feedback into the security system accordingly. Appx164(1:44–50).

The '641 patent is directed to a system and a method where status data—for example, network traffic data such as an IP address, Appx23—is compared against a set of rules (that is, filtered). If the status data does not match a filter and looks interesting, it is sent to a human analyst for further evaluation. The rules are then updated based on the analyst's evaluation.

Specifically, a "probe" collects status data at various network components and applies filters to the data. If the status data matches a filter, data is selected or discarded based on that filter. If the status data does not match a filter, it is analyzed and—if found interesting—forwarded to an "analyst system" for further evaluation. An analyst determines the import of the status data and updates the filtering rules at the probe. By outsourcing the evaluation of unfiltered data to an analyst system, the system administrator does not have to become an "expert[] on every kind of intrusion." Appx164(1:41–42).

Figure 2 provides "a system overview of an exemplary embodiment" of the purported invention. Appx167(8:41–42).



FIG. 2

Appx156(FIG. 2) (annotated). "Data collected by sensors 1010, 1020, 1030 and 1040 . . . are collated by sensor data collator 2010." Appx167(8:47–51). "[D]ata is first filtered by negative filtering subsystem 2020, which discards uninteresting information, and then by positive filtering subsystem 2030, which selects possibly interesting information . . . ." Appx167(8:51–55). Following this initial filtering, "[d]ata neither discarded by negative filtering subsystem 2020 nor selected out as interesting by positive filtering subsystem 2030"—dubbed "residue"—"is sent to anomaly engine 2050 for further analysis." Appx167(8:55–59). "Interesting" data is then forwarded for review by a human analyst. Appx167–168(8:66–9:2, 9:13–21, 9:54–62). Based on that review, "[t]he software and filters" of the probe/sentry

system "may be manually updated offline or dynamically (that is, during actual operation)." Appx166(5:32–35).

Independent claim 1 recites this general data filtering and update process:

1. A system for operating a probe as part of a security monitoring system for a computer network, the system comprising:

a) a sensor coupled to collect status data from at least one monitored component of the network;

b) a filtering subsystem coupled to analyze status data to identify potentially security-related events represented in the status data, wherein the analysis includes filtering followed by an analysis of post-filtering residue, wherein the post-filtering residue is data neither discarded nor selected by filtering;

c) a communications system coupled to transmit information about the identified events to an analyst system associated with the security monitoring system;

d) a receiver for receiving feedback at the probe based on empirically-derived information reflecting operation of the security monitoring system; and

e) a modification control system for dynamically modifying an analysis capability of the probe during operation thereof based on the received feedback.

Appx180(33:25–45). Dependent claim 2 further provides that the "identifying step" (presumably a reference to limitation 1.b) "includes performing a multi-stage analysis of the status data." Appx180(33:46–47). Claim 6 requires that "multi-stage analysis" to "include[] analysis at the probe and analysis at a secure operations center configured to receive data from the probe." Appx180(33:54–56).

6

Of note, the "dynamically modifying" step of independent claim 1 does not appear in independent claim 18. Appx180(34:22–39).[1]

## B.    Prosecution history and previous IPR challenge

During prosecution of both the '641 patent and its parent, U.S. Patent No. 7,159,237, BTA's amendments and arguments focused solely on distinguishing the "post-filtering residue" limitation from the cited prior art. Appx357; Appx659 (amending issued claim 18 of the '641 patent to recite "wherein the potentially security-related event is identified by filtering followed by an analysis of post-filtering residue, wherein the post-filtering residue is neither discarded nor selected by the filtering"); Appx661; Appx1344 (making a similar amendment to claim 1 of the '237 patent); Appx1425–1426.

For example, to obtain allowance of the '237 patent claims, BTA argued that the prior art disclosed data selected by filtering and data discarded by filtering, but not "data that could be considered post-filtering residue." Appx1425–1426; Appx661 (similarly arguing patentability of the '641 patent claims based on this element); Appx357. And BTA escaped a previous IPR challenge to the '641 patent

---

[1] The patent describes a security monitoring service that includes a specific "Secure Operations Center Responsive Analyst Technical Expertise System" ("SOCRATES"). Appx165(3:61–62); *see* BBr. 12–14 (discussing details of "SOCRATES"). But the claims do not require this implementation. Rather, they recite only a generic "analyst system" and a generic "secure operations center." Appx180(33:36–38, 33:54–56).

based solely on arguments directed to this element. Appx1042–1050; Appx357.

Yet, in this appeal, BTA notably does not dispute the Board's finding that analyzing "post-filtering residue" would have been obvious. Rather, BTA's arguments focus on the "dynamically modifying" limitation present only in claim 1 and on the Board's motivation-to-combine finding. BBr. 33–55.

## II.    THE PRIOR ART

### A.    Duvall's filtering system

Duvall discloses a system for "filtering messages transmitted between the Internet and a client computer" to ensure that content implicating security concerns does not reach recipients. Appx864(1:7–24). Messages are filtered using "direct action" filters that "ALLOW" or "BLOCK" messages. Appx865(3:64–66). If the message is neither ALLOWED nor BLOCKED, the message may be subjected to "deferred actions," which apply another layer of analysis to the message. Appx865–866(4:12–5:19). Duvall provides a step-by-step process for evaluating a message: "The filters are preferably stored so that the system searches ALLOW filters first, BLOCK filters next, and deferred action filters last, and takes action based on the first matched filter." Appx865(4:27–30).

Duvall explains that a server "on the client's own network" can provide the filtering system—an arrangement "desirable . . . in a corporate network that has a limited size and a uniform set of filters for many users." Appx867(8:18–23).

8



Appx858(FIG. 1) (annotated). "[F]iltering information [is] stored in a filter database," which can be stored on the server coupled to the client's network "and can thus be incorporated into a firewall, gateway, or proxy server." Appx864(1:30–35, 1:59–64). "Each filter in the filter database [] has a field specifying an action to be taken by the client." Appx865(4:12–15).

Duvall's general filtering process is illustrated in Figure 3:



FIG.3

Appx859(FIG. 3) (annotated). At step 104, when a data transmission is received, Duvall's system determines if any direct action filters "require immediate action, i.e., if unconditional allowing or blocking is required (steps 104 and 106)." Appx865(4:38–55). Data transmissions that do not match the direct action ALLOW or BLOCK filters in step 104 constitute residue data. The system then determines at step 116 "whether to take "deferred action" on that residue data. Appx865–866(4:65–5:29); Appx860(FIG. 4) (illustrating Duvall's deferred-action analysis). After performing this residue analysis, "[i]f there is also no deferred

10

action, the system can default to allow the transmission (step 108 [of FIG. 3]), or it can default to block the transmission (steps 110 and 112)." Appx866(5:1–3).

Duvall further discloses an "editing Manager" that allows users "to make custom changes [to filters] if the user believes that the filtering system is filtering too much or too little." Appx867(8:2–8); Appx770(¶107). The editing manager is implemented "based on known database editing techniques." Appx867(8:10–11).

## B.    Chu's human-intervention techniques

Chu provides techniques for determining whether to block or allow unknown data through a network. These techniques can be used if, for example, a user attempts to download potentially malicious software from a Web page. Appx881; Appx895; Appx916. Chu's "trust management infrastructure" implements various policy languages that allow users to make decisions about data transmitted over the Internet. Appx900; Appx907–915.

Chu discloses sample policies that address whether content at a particular URL should be trusted. Appx915–920. For example, Chu can use a "blacklist" ("sites or directories [the system] should not download codes from") and a "whitelist" ("sites know[n] to be trustworthy")—similar to Duvall's BLOCK and ALLOW filters—designed to prevent transmissions from "Web sites that serve potentially dangerous" content. Appx916. An exemplary Chu policy is shown below. *Id.* If a URL is unknown (i.e., it is not in the blacklist or whitelist), the user

is prompted for attention. *Id.* "User intervention is needed only when the given URL is in neither the blacklist nor the whitelist." *Id.*



Appx916 (annotated); Appx755–756(¶¶82–83). Thus, in contrast to Duvall's default allowing or blocking action, Chu teaches human intervention to resolve unknown data for which there is no existing filter. *Id.*

## III. THE PROCEEDINGS BELOW

PAN filed an IPR petition challenging claims 1–25 of the '641 patent as obvious over—as relevant here—Duvall and Chu. Appx354. Claims 1 and 6 are principally relevant to this appeal.

### A. The Board finds the "dynamically modifying" limitation of independent claim 1 obvious.

Independent claim 1 of the '641 patent recites "a modification control system for dynamically modifying an analysis capability of the probe during operation thereof based on the received feedback." Appx180(33:42–44).

"Dynamically" simply means "during actual operation" of the system (that is, not when the system is offline). Appx166(5:34–35). PAN showed—and the Board agreed—that Duvall discloses this element.

1.      PAN's petition explained that "[e]diting the filters in Duvall's filter database" satisfies this limitation. Users can edit the filters while the system is operating. Those updates, in turn, modify the analysis capability of Duvall's probe "because Duvall operates by comparing 'information in the data stream to the filter entries stored in the database to determine whether some action needs to be taken.'" Appx389 (citing Appx865(4:22–27)). As PAN's expert Dr. Jeffay explained, Duvall's "filtering system compares portions of incoming and/or outgoing messages with filtering information stored in a filter database." Appx801(¶150) (citing Appx864(1:30–35)). Thus, "[a]s filters are added, deleted, or modified, Duvall's analysis reflects these updates," meaning "the analysis capability of the server 30"—Duvall's "probe," Appx780–781(¶120)—"would be modified." Appx801(¶150); Appx389.

Dr. Jeffay further explained that Duvall's filtering system accommodates dynamic updates because, under standard database technology, "entries can be edited or added without taking the system offline." Appx802(¶153). Since Duvall "'searches the filter database for matching filters' when a new data stream is opened, the 'analysis capability of said probe' always reflects the latest and current

set of filters." Appx802(¶153) (citing Appx865(4:40–43)); Appx390. So Duvall's filter database allows for updating the probe's analysis capability "during actual operation," in line with the '641 patent's description. Appx166(5:32–35).

PAN and its expert presented further evidence in reply demonstrating that none of Duvall's components needs to be taken offline to update filters (and therefore update the analysis capability of Duvall's filtering system). Appx3057–3060; Appx3085–3090(¶¶19–25). Dr. Jeffay explained that "Duvall's system relies on 'known database editing techniques,' which provided the dynamic modification capability required by the claims." Appx3085–3086(¶19) (citing Appx867(8:11–14)). As Dr. Jeffay noted, "[d]atabase-management systems use a form of concurrency control to enable simultaneous ('concurrent') access of the same data by multiple users," enabling data updates during operation. Appx3086(¶21). Therefore, "the use of a standard commercially-available database-management system at the time of the '641 patent would have enabled . . . database entries to be queried (i.e., read) while simultaneously being written to," without taking any components offline. Appx3085–3090(¶¶19–25) (citing Appx3092; Appx3129–3130; Appx3148–3364; Appx3398; Appx3433–3434; Appx4007; Appx4267–4268; Appx5080–5104)); Appx3059–3060.

2. The Board agreed with PAN. Crediting Dr. Jeffay, the Board found that Duvall "ties its editing manager database functionality to known commercial

14

databases," which could "perform dynamic modification via online editing." Appx58 (citing Appx3059–3060; Appx3085–3088(¶¶19–23)). The Board explained that Duvall's filter updates may occur while "Duvall's filtering system is operational," for example, "while the processor's implementing software monitors a port as it does at step 100 of Figure 3." Appx61–62 (citing Appx378; Appx865:4:37–42)). The Board also noted that the '641 patent itself does not describe the "'dynamically modifying' functionality" in "any detail," further supporting the notion that "the claimed 'dynamic modification' would have been well within the capability" of a skilled artisan. Appx59–60.

3.      BTA requested rehearing, arguing that PAN had shown only that Duvall's database—not its *probe*—could be dynamically modified. Appx5561–5562. The Board disagreed. Duvall discloses the use of "known database editing techniques," Appx867(8:11–12), and BTA had "concede[d]" that "known databases at the time of the invention provided dynamic modification functionality." Appx144–145. And the Board found "persuasive[]" PAN's showing "that modifying Duvall's database filters results in modifying its analysis capabilities." Appx145–146 (citing and reaffirming the analysis from the final written decision); *see also* Appx100 ("Duvall's filtering system accommodates dynamic updates because it searches 'filter entries stored in the database' when

performing its analysis, . . . which would reflect [prior] changes to filters as they are edited.").

In the present appeal, BTA seeks to raise the same arguments about the "dynamically modifying" limitation that the Board rejected on rehearing.

## B.  The Board finds that a skilled artisan would have been motivated to combine Duvall and Chu.

PAN's petition also explained why a skilled artisan would have been motivated to combine the teachings of Duvall and Chu. The Board again agreed.

1.    Duvall's filtering system searches ALLOW filters first, BLOCK filters next, and deferred action filters last. Residue data—that is, data not matching an ALLOW or BLOCK filter—that also does not match a deferred action filter may be allowed or blocked by default. Appx364 (citing Appx865(4:22–51)); Appx367 (citing Appx866(5:1–3)). Duvall's default action, however, "could lead to inefficiencies," resulting in the "filtering system [] filtering too much or too little." Appx770(¶107) (citing Appx867(8:6–8)); Appx367. For example, Duvall's default action "can lead to allowable data being blocked, or more importantly, harmful data being allowed through the system." Appx770(¶107); Appx367.

PAN thus argued that a skilled artisan "would have been motivated to incorporate Chu's user intervention into Duvall's system for data transmissions not matching any of Duvall's positive/negative filters at step 104 [of Figure 3] nor

resolved by Duvall's post-filtering residue analysis." Appx369; Appx772–773(¶111). Rather than defaulting to allowing or blocking an unmatched transmission, a person could make "changes [to filters] if the user believes that the filtering system is filtering too much or too little." Appx369–370 (citing Appx867(8:5–7)); *see* Appx772–774(¶¶111–112). And, "in Duvall's corporate environment, where a 'uniform set of filters for many users' is provided," a skilled artisan "would have understood that the person making the changes to these filters would be a person trained in network administration and security." Appx369–370 (citing Appx867(8:18–26)); *see* Appx772–774(¶¶111–112).

In response, BTA argued that PAN "assumes that Duvall has an unresolved problem with 'filtering too much or too little'"—an assumption BTA said was "undermined by the fact that Duvall explicitly discloses that a 'user [can] make custom changes' using the editing manager to resolve that very problem." Appx2395. BTA also argued that "Chu's prompted user likely has less expertise than whoever has the authority to edit Duvall's filters." Appx2397.

PAN's reply explained that it was not "propos[ing] a new filter-editing mechanism in Duvall." Appx3045. Rather, the proposed combination aimed "to improv[e] the process for determining when to edit filters." *Id.* (citing Appx367–371). PAN also noted that it was not relying on Chu's user but instead on Chu's disclosure that a person, as opposed to software, could be empowered to make

17

filtering decisions. Appx3046. More specifically, in the context of Duvall's corporate setting, "the person making the changes to [Duvall's] filters would be a person trained in network administration and security, not each individual employee at their own computer." Appx3046 (citing Appx369–370). In its sur-reply, BTA alleged that PAN had "rewrit[ten]" its motivation to combine. Appx5121.

2.      The Board agreed with PAN, finding that a skilled artisan would have incorporated Chu's use of human intervention into Duvall. Appx46–47. And, because Duvall uses a "uniform set of filters for many users" for "a corporate network," "the decision of how to handle unresolved data would not be left to each user individually, but rather, to a group of people trained in making such decisions, such as analysts at a network-security service." Appx43 (citing Appx387; Appx867(8:18–23)); *see also* Appx48 (skilled artisan "'would have been motivated to assign the role of managing and editing filters to a group of people having the expertise to properly evaluate whether 'the filtering system is filtering too much or too little,' *rather than the individual receiving the illicit content*'" (citing Appx387) (Board's emphasis)).

The Board expressly credited Dr. Jeffay's explanation—supported by citations to several prior-art analyst systems—that such a system "would have been advantageous in Duvall's system." Appx42–44 (citing Appx795–796(¶142);

18

Appx1918; Appx1935(1:49–60); Appx1958(2:16–20)); *see also* Appx47–48

(citing Appx3084–3085(¶17)). The Board further credited Dr. Jeffay's opinion that

adding an analyst system to Duvall "would have involved minimal modifications

to Duvall's system" and would have "provid[ed] the advantage of trained security

analysts to analyze data . . . to resolve residue data as suggested by Chu." Appx47

(citing Appx774–775(¶114); Appx795–796(¶142)).

The Board also rejected BTA's argument that PAN altered the motivation to

combine Duvall and Chu in its reply. Appx49–50. As the Board correctly

summarized, PAN had consistently "relie[d] on Chu as further suggesting to decide

if or when to modify Duvall's system so that the system does not ultimately filter

too much or too little." Appx50. This combination would have "improve[ed] the

filter system by using a group of analysts to obtain a uniform decision with respect

to a corporation's filters as to a security/trust decision." Appx50.

3.      BTA petitioned for rehearing on this issue as well. It raised a number

of new arguments, including contentions that the proposed combination "would

require a fundamental change to Duvall's principle of operation" and "that

prompting an end-user . . . each time a decision could not be reached would

overwhelm that person and lead to the problems the 641 patent solves."

Appx5559–5560. As the Board noted, BTA did "not provide any citation to its

briefing as to where it made" these arguments. Appx139; Appx141. Nevertheless,

the Board addressed the arguments on the merits, explaining that it had found "credible" Dr. Jeffay's testimony "showing that the combined system of Chu and Duvall would have provided benefits to Duvall's system." Appx141. The Board further reiterated its finding that the combination "would have involved 'nothing more than use of [a] known technique to improve similar devices, methods, or products in the same way.'" Appx139 (citing Appx793–794(¶138)).

**C.    The Board finds the "multi-stage analysis" of claim 6 obvious.**

Claim 6 depends from claim 2, which requires "the identifying step" to "include[] performing a multi-stage analysis of the status data." Appx180(33:46–47). Claim 6 requires that "the multi-stage analysis include[] analysis at the probe and analysis at a secure operations center configured to receive data from the probe." Appx180(33:54–56). The Board found that the Duvall-Chu combination renders these elements obvious.

1.    For claim 2, PAN argued that "Duvall evaluates status data in multiple stages, first 'determin[ing] if any require immediate action,' and then 'determin[ing] whether a deferred action must be taken.'" Appx390 (citing Appx865–866(4:38–50, 4:65–5:1, 5:8–29)). PAN also argued that "Duvall in view of Chu teaches an additional analysis stage involving a user (e.g., trained professional) to further evaluate residue data transmissions." Appx391.

For claim 6, PAN explained that "[t]he Duvall-Chu combination teaches analysis at a probe followed by analysis at an analyst system," and that a skilled artisan "would have understood the analyst system could be on-site or at a secure remote site, i.e., 'a secure operations center configured to receive data from the probe.'" Appx392–393 (citing Appx1918 (discussing a well-known off-site "network operations center")). And, as Dr. Jeffay explained, a skilled artisan "would have been motivated to ensure that the trained network professionals managing Duvall's filtering system were doing so as part of a 'secure operations center'" to "ensure that unauthorized users could not edit, add, or remove filters that could potentially allow malicious traffic to enter the corporate network." Appx809(¶173); Appx394.

BTA did not make any arguments directed to claim 2. But BTA argued that PAN's showing on claim 6 was deficient because the SOC analysis PAN pointed to occurred after the "identifying step" of claim 1. Appx2424–2425. Even though claim 1 covers a system—not a method—BTA took the position that the identifying step (that is, limitation 1.b) must be complete before transmission of information to the analyst system in limitation 1.c.

2.     The Board found claim 2 obvious because "Duvall's Figure 4 discloses an iterative multi-stage process analysis of residue status data, and the combination of Duvall and Chu teaches an additional analysis" of that data

21

"involving a trained professional." Appx82–83. The Board then addressed and rejected BTA's arguments on claim 6. Appx85–87.

The Board recognized that, in PAN's obviousness combination, "a multi-stage analysis occurs at the probe . . . . and at the SOC, as claim 6 requires." Appx86. "[T]his results in information flowing both ways—from the probe to the SOC, and from the SOC to the probe." Appx86. Agreeing with the analysis in PAN's petition, the Board explained that, in the Duvall-Chu system, "an analyst system [at the SOC] would receive residue data [at the probe], evaluate that data, update the respective filters [thereby identifying events in limitation 1.b], and provide those updates to the corporation [which includes the analyst system at the probe] per the terms of the subscription [i.e., thereby transmitting information at limitation 1.c]." Appx86 (quoting Appx394) (bracketed clarifications the Board's). So the Board determined that, even if the claims require limitation 1.c to occur after limitation 1.b is completed, the Duvall-Chu combination rendered claim 6 obvious. Appx87.

3.      BTA repeated its claim 6 arguments in its rehearing request, arguing that PAN had not shown "that information flows both ways *before* identified events are transmitted to the analyst as required by limitation 1(c)." Appx5564 (citing Appx86). The Board, once again, disagreed. It reiterated "that the combined system of Duvall-Chu flags (identifies) unresolved residue data processed during

22

limitation 1.b per the multi-stage analysis of claim 6 at the probe and SOC for further analysis and then sends information about that identified residue data from the SOC to the corporation during limitation 1.c." Appx150.

The Board also noted that "[l]imitation 1.b does not preclude sending information between a probe and an SOC about events or identified events to perform the multi-stage analysis of claims 2 and 6." Appx150. And PAN had "show[n] how the Duvall-Chu iterative multi-stage system performs dependent claim 6 per limitation 1.b's requirements *before* the Duvall-Chu system performs limitation 1.c's requirements"—even if PAN had "*also show[n]* that Duvall-Chu's iterative process *also performs* at least some aspects that may otherwise satisfy limitation 1.c during the analysis of limitation 1.b." Appx151.

*　　*　　*

The Board therefore found all challenged claims unpatentable as obvious. This appeal followed.

SUMMARY OF THE ARGUMENT

This Court should affirm the Board's findings that claims 1–25 are obvious.

I.　　The Board correctly found the "dynamically modifying" limitation obvious. "Dynamically" simply means "during actual operation rather than offline." Appx166(5:32–35). Duvall's filter database relies on "known database editing techniques," Appx867(8:11–12), and PAN presented voluminous evidence

23

that known database editing techniques allow for editing the database "without taking the system offline." Appx390; Appx802(¶153).

BTA has never disputed—either below or on appeal—that databases at the time of the invention provided dynamic modification functionality. Instead, BTA says there is a "gap between the alleged dynamic modification of a database" and "the claimed dynamic modification of Duvall's analysis capabilities in the probe." BBr. 40. But the Board thoroughly debunked that contention both in its final written decision and on rehearing, finding that "modifying Duvall's database . . . results in modifying its analysis capabilities." Appx144–146; Appx55–62. Duvall's probe's filtering capability depends on the contents of the database at any given time. Accordingly, if the database is dynamically updated, the probe's capabilities are likewise dynamically updated because it uses that now-updated database to filter status data. *See* Appx55, Appx57–62; Appx144–146.

On appeal, BTA contends that a supposed "cache coherency problem" could lead to a "lack of fidelity between the database and [a] cached copy during real time operations." BBr. 36. BTA forfeited this argument by failing to raise it in its papers below. The argument also fails on the merits. Duvall does not rely on a cached copy of the filter database. And, even if it did, "known techniques" at the time of the patent, like "running cache protocol updates," would have addressed any such issue. Appx59.

BTA's allegation of legal error based on *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354 (Fed. Cir. 2018), *see* BBr. 33, is meritless. The Board did not find that Duvall would need to be *modified* to update its filter capabilities dynamically. Again, Duvall's filter database relies on known database editing techniques, and the Board found that databases at the time permitted dynamic modification. So Duvall discloses this functionality already. The Board's factual findings are supported by far more than substantial evidence.

II. The Board also correctly determined that a skilled artisan would have been motivated to combine Duvall and Chu. Duvall discloses positive and negative filtering (ALLOW and BLOCK filters), followed by an analysis of post-filtering residue (through deferred-action filters). If none of these steps results in an action, Duvall's system may take a default action. Duvall recognizes, however, that a default action may result in "filtering too much or too little." Appx867(8:5–7). Chu teaches a solution to this problem: prompt a human for action instead of specifying a default. A skilled artisan would have been motivated to combine these two approaches so users can "make custom changes" to filters if the filters are "filtering too much or too little." Appx370 (citing Appx867(8:5–7)).

BTA's lead argument to the contrary—that PAN changed its proffered motivation to combine in reply, BBr. 43–45—is meritless. PAN's argument has always been that incorporating Chu's human intervention into Duvall—

specifically, through a group of trained analysts—would allow the human "to decide if or when to modify Duvall's system so that the system does not ultimately filter too much or too little, thereby improving the filter system." Appx50.

BTA's next argument—that "Chu teaches prompting an end-user" and that "giving control over to the end-users of Duvall's system would be antithetical to its purpose," BBr. 46—fares no better. PAN never relied on Chu's "end-user" in its proposed combination. Rather, PAN explained that the human intervening in Duvall's corporate environment would be a person trained in network administration and security. Appx370; Appx867(8:18–23). BTA's argument here amounts to a contention that Chu's approach could not be bodily incorporated into the Duvall system. But bodily incorporation is not the standard for obviousness.

BTA also criticizes the Board for relying on references outside PAN's obviousness grounds that describe well-known third-party security systems. BBr. 48; Appx48. But there was nothing wrong with that. The Board may— indeed, should—rely on evidence describing the state of the art in making an obviousness determination. The fact that human analyst systems were commonplace at the time of the invention is decidedly relevant to obviousness here, and the Board did not err in considering that fact in its analysis.

Finally, BTA argues that the combination of Duvall and Chu would "result in an inoperable system." BBr. 49–55. These arguments were not presented below

and should be rejected for that reason alone. Regardless, Chu's techniques would not render Duvall's system inoperable. As the Board recognized, Chu's techniques would further Duvall's goals, "optimiz[ing] the handling of unresolved residue data in order to avoid 'filtering too much or too little' in Duvall." Appx51. That finding is supported by substantial evidence.

III.    The Board's analysis of claim 6 was likewise sound. BTA asserts that the Board failed to identify analysis at a secure operations center during the "identify[ing]" step of limitation 1.b. BBr. 55. But the Board expressly identified that analysis in both its final written decision and rehearing decision, finding "the multi-stage analysis of claim 6 at the probe *and SOC*" occurs "during limitation 1.b." Appx150 (emphasis added); Appx86. Aside from ignoring this finding, BTA conflates the recited "secure operations center" and "analyst system," urging a claim interpretation that would require the analyst system to transmit information to itself. BBr. 56. The Board correctly rejected this "anomalous outcome." Appx87 n.17. As the Board found, the Duvall-Chu combination performs the same sequence of operations described in the '641 patent. Appx86.

IV.    This Court's precedent forecloses BTA's argument that the Board lacked jurisdiction to review the '641 patent. *See Apple Inc. v. Gesture Tech. Partners, LLC*, 127 F.4th 364, 369 (Fed. Cir. 2025). BTA also forfeited this

argument by failing to sufficiently develop it on appeal. *See Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1385 (Fed. Cir. 2019).

## STANDARD OF REVIEW

This Court "review[s] the Board's ultimate obviousness determinations de novo and its underlying factual findings for substantial evidence." *Voice Tech Corp. v. Unified Pats., LLC*, 110 F.4th 1331, 1342 (Fed. Cir. 2024). "Motivation to combine is one of those underlying factual issues." *Id.*; *see also Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017).

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938). "If two inconsistent conclusions may reasonably be drawn from the evidence in record, the [Board's] decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1356 (Fed. Cir. 2018) (cleaned up). Thus, even if this Court might "have decided the factual dispute at hand differently than the Board did, it is not the province of this court to do so." *Roku, Inc. v. Universal Elecs., Inc.*, 63 F.4th 1319, 1326 (Fed. Cir. 2023). And this Court "defer[s] to the Board's findings concerning the credibility of expert witnesses." *Sage Prods., LLC v. Stewart*, 133 F.4th 1376, 1380–81 (Fed. Cir. 2025).

## ARGUMENT

I. **THE BOARD DID NOT ERR IN FINDING THE "DYNAMICALLY MODIFYING" LIMITATION OF CLAIM 1 OBVIOUS.**

### A. BTA's arguments do not apply to claims 18–25.

One point bears mention at the outset. BTA asks for reversal "as to all claims" based on its arguments about the "dynamically modifying" limitation. BBr. 40. But independent claim 18 contains no such limitation. *Contra* BBr. 1 (incorrectly referring to "the 'dynamic modification' limitation recited in the independent *claims*") (emphasis added). This argument thus provides no basis to reverse the Board's decision with respect to claims 18–25.

### B. The Board correctly determined that the combination of Duvall and Chu teaches the claimed dynamic modification.

As PAN showed, "Duvall operates by comparing 'information in the data stream to the filter entries stored in the database to determine whether some action needs to be taken.'" Appx389 (quoting Appx865(4:22–27)). And "Duvall's filtering system accommodates dynamic updates because it searches 'filter entries stored in the database' when performing its analysis, . . . which would reflect [prior] changes to filters as they are edited." Appx390. The Board agreed:

> Based on Duvall's disclosure that ties its editing manager database functionality to known commercial databases and evidence describing same, *as Petitioner shows, prior art databases, such as Duvall's, were not only at least capable of, but configured to, perform dynamic modification* via online editing where "techniques for solving this

29

problem were well known in the art and already incorporated into commercially available database-management systems."

Appx58 (citing Appx3059–3060, emphasis added); *see* Appx54. These findings are supported by substantial evidence.

Start with Duvall itself. Duvall states that "[t]he implementation and use of the editing manager are generally based on known database editing techniques." Appx57 (quoting Appx867(8:11–16)). As Dr. Jeffay explained, "a main benefit of databases is that entries can be edited without taking the system offline, which prevents the filtering system from being down during updates." Appx802(¶153). So the analysis capability of Duvall's probe "always reflects the latest and current set of filters." Appx802(¶153).

Dr. Jeffay further provided evidence that "a standard commercially-available database-management system at the time of the '641 patent would have enabled a database entries to be queried (i.e., read) while simultaneously being written to" using standard "concurrency control" schemes. Appx3085–3090(¶¶19–25) (citing Appx3092; Appx3129–3130; Appx3148–3364; Appx3398; Appx3433–3434; Appx4007; Appx4267–4268; Appx5080–5104); Appx3059–3060. Accordingly, Duvall's standard database would not need to be taken offline to update its filters. Appx801–802(¶¶151–153). Indeed, BTA *conceded* "that known databases at the time of the invention provided dynamic modification functionality." Appx145.

What is more, as the Board observed, the '641 patent provides only one sentence describing the claimed dynamic modification: "filters of probe/sentry system 2000 . . . may be adaptive or, alternatively, may be manually updated offline or dynamically (that is, during actual operation)." Appx166(5:32–35); Appx59–60. That the inventors saw no need to explain how this dynamic modification works reinforces the point that skilled artisans were "'more than capable of' performing that claimed feature." Appx59–60 (citing *Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1339 (Fed. Cir. 2020)). Again, the ability to update filters during operation is precisely the operation enabled by standard commercially-available databases like Duvall's. Appx58; Appx3059–3060.

In short, the Board's finding that Duvall discloses the "dynamically modifying" limitation is amply supported by the evidence. Appx56. And the Board's decision to credit Dr. Jeffay's explanation of the prior art is entitled to deference. *Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1372 (Fed. Cir. 2020) (Board enjoys "discretion to weigh the credibility of expert testimony"); *Sage Prods.*, 133 F.4th at 1380–81 (similar).

### C. BTA's arguments ignore the factual record and the Board's detailed analysis.

#### 1. The Board correctly tied Duvall's analysis capability to modification of filters in Duvall's filter database.

BTA does not dispute that Duvall's database can be "dynamically modified without taking the database offline." BBr. 35–36. But BTA argues that there is "a gap between the alleged dynamic modification of a database . . . and the claimed dynamic modification of Duvall's analysis capabilities in the probe." BBr. 40.

There is no gap. As the Board recognized, Duvall's "filtering system detects when the client opens the data stream for a particular port and IP address (step 100), and *searches the filter database for matching filters*." Appx865(4:40–43) (emphasis added); Appx55; Appx61. And, "[s]ince Duvall's system 'searches the filter database for matching filters' when opening a new data stream, the 'analysis capability of said probe' always reflects the latest and current set of filters. Appx390 (citing Appx865(4:40–43)). Or, as the Board put it: Duvall "implicitly discloses or renders obvious the limitation based on what a skilled artisan would have known about existing database techniques, . . . which allowed a database to be queried (i.e., remain online) while simultaneously being written to." Appx57. In other words, because Duvall's analysis searches the filter database, the analysis would be dynamically modified as filter updates are made to reflect the current set of filters in the database. Appx55–58; Appx389–390.

Notably, BTA raised the same issue on rehearing that it now raises on appeal. Appx5562. The Board thoroughly considered it and again found that "modifying Duvall's database as Duvall discloses and suggests results in modifying its analysis capabilities." Appx145–146. That finding is amply supported by the record.

### 2. BTA's "cache coherency" argument is both forfeited and meritless.

BTA does not acknowledge—much less attempt to rebut—the Board's analysis in the rehearing decision. Instead, BTA hangs its argument on the assertion that "Duvall's 'probe' explicitly relies on a cached copy of the database that is 'copied to RAM during operation.'" BBr. 36 (citing Appx865, 3:45-48); *see also id.* at 27.[2] Therefore, according to BTA, "any updates to the original database will have no impact on capabilities of the probe—whatsoever—until the probe restarts and caches a new copy of the now-updated database." BBr. 36. This line of argument fails for multiple reasons.

a. As an initial matter, BTA never raised this issue in its IPR briefing. *See* Appx2421–2424. Although BTA mentioned the word "cache," Appx2423, it

---

[2] Although BTA asserts that this "problem is only one example why dynamic modification of the probe depends on the implementation details of the probe rather than the mere existence of a dynamically modifiable database," BBr. 36–37, BTA provides no other examples.

never argued that Duvall's system must use a cached copy of its filter database. Indeed, after BTA belatedly raised the cache coherency issue at the oral hearing, Appx5514(54:5–17), the Board noted that it was a "new argument." Appx5517(57:11).[3] BTA thus forfeited this contention, and the Court need not consider it. *See Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364, 1369 (Fed. Cir. 2018) (argument first raised at oral hearing is forfeited); *Cablz, Inc. v. Chums, Inc.*, 708 F. App'x 1006, 1011 (Fed. Cir. 2017) (same).

      b.      Regardless, BTA's cache coherency argument fails on the merits. BTA's assertion that Duvall "explicitly relies on a cached copy of the database that is 'copied to RAM during operation,'" BBr. 36, mischaracterizes the reference.

     To be sure, Duvall discloses a client-side embodiment in which its filter database *may be* copied to RAM: "*[I]n a first embodiment* of the present invention, a filtering system resides in a client computer 10. . . . The filter database would typically be maintained in the client computer's hard drive, and *could be* copied to RAM during operation." Appx865(3:41–48) (emphases added). But Duvall neither "explicitly relies" on nor requires this configuration to operate. *Contra* BBr. 36.

---

[3] In response to that statement from the Board, BTA's counsel cited pages 37 and 39 of its patent owner response. Appx5530(70:18–25). But those pages are devoid of any contention about cache coherency problems with Duvall's system. *See* Appx2423; Appx2425.

And, as the Board recognized, PAN "relie[d] on Duvall's *server-based* teachings," Appx24 (citing Appx378)—not the client-side embodiment. Duvall's discussion of the server-side embodiment does not mention caching. Appx867–868(8:18–9:11).

Finally, even if Duvall's copying of its filter database to RAM were a preferred embodiment, it would not matter. "[T]hat a specific embodiment is taught to be preferred is not controlling," since even "unpreferred embodiments[] must be considered" in the obviousness analysis. *Merck & Co. v. Biocraft Lab'ys., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989); *accord Recor Med., Inc. v. Medtronic Ireland Mfg. Unlimited Co.*, 2025 WL 944511, at *2 (Fed. Cir. Mar. 27, 2025).

In short, Duvall's disclosure of one client-side embodiment in which its filter database is copied to RAM does not suggest that *every* implementation of Duvall would have the cache coherency problem posited by BTA.

c.      Even if BTA had preserved this argument (it did not), and even if all Duvall's embodiments had a cache coherency issue that would impede dynamic updating of the probe's capabilities (they do not), a skilled artisan could have readily recognized and resolved any such issue. Appx59.

It bears repeating that "the '641 patent does not describe the claimed 'dynamically modifying' functionality" in any detail—which "'suggest[s] that a person of ordinary skill in the art was more than capable of' performing that claimed feature." Appx59–60 (quoting *Uber Techs.*, 957 F.3d at 1339). The Board

correctly found that "[t]his lack of detail" "undercut[]" BTA's expert's "testimony that cache consistency and other alleged problems associated with using RAM prevents the dynamic database functionality with respect to Duvall's known database techniques." Appx60.

The Board also credited Dr. Jeffay's testimony that any required modification to Duvall's database would have been "routine given that dynamic modification was a common database feature at the time of the invention." Appx59 (noting that this testimony was "supported by cited record evidence"). In particular, Dr. Jeffay explained that, to the extent necessary, a database system would "run a cache consistency protocol to make sure the cache always has fresh contents," which "is a classic problem in databases, and actually transcends databases." Appx2632(165:1–6); Appx59 (Board citing same). Dr. Jeffay also testified that a skilled artisan would have known of "protocols to mitigate the effects of cache inconsistency"; indeed, such protocols are "all wrapped up in Duvall's disclosure of known database editing techniques." Appx2633(166:4–11); *see also* Appx2630–2631(163:17–164:18) (Duvall's discussion of caching refers to "the fact that search results can be sorted in RAM as a performance optimization," which is a "classic, very straightforward database operation[]"). The Board agreed, noting that "known techniques" at the time included "running cache protocol updates." Appx60.

36

Further, even setting aside these known solutions, the Board found that "Duvall's probe is operational" when "the system is monitoring ports." Appx61–62. And BTA did not even argue "that there is a cache coherency problem for dynamic updates while the system merely monitors a port." *Id.*[4] Thus, even if caching of Duvall's filter database were required (it is not), the Board correctly found that BTA's "cache coherency" argument did "not undermine [PAN]'s showing" of obviousness. Appx59.

d.     BTA's arguments about a potential "lack of fidelity between the database and the cached copy during real time operations," BBr. 36, ignore the broad meaning of "dynamically" in the '641 patent. "Dynamically" just means during operation. Appx59–60; Appx2392. That is, the claimed dynamic modification does not require "real time" updates of the probe's analysis capability. As BTA elsewhere concedes, to show that Duvall does not provide dynamic updating, BTA would have to establish that "any updates to [Duvall's] original database will have *no impact on capabilities of the probe—whatsoever— until the probe restarts*." BBr. 36 (emphasis added).

---

[4] In a footnote, BTA argues that Duvall cannot "retroactively block already-opened connections." BBr. 37 n.5. Wrong. As the Board found, "Duvall's Figure 3 contradicts" BTA's argument on this score because it clearly shows applying direct action filters to an open stream." Appx40–42; Appx859(FIG. 3). BTA does not challenge—or even address—this finding. BBr. 37 n.5.

BTA provides no evidence to support such a contention. BTA cites only its expert's testimony, who just said that caches can "be out of date." Appx2901–2902(¶139). But BTA's expert never asserted that Duvall's probe would have to be *restarted* to solve this supposed "cache consistency" problem. *Id.* Indeed, BTA's expert conceded that there is "an entire field of art devoted to resolving such problems." *Id.* So BTA's cache coherency argument—even setting aside all its other flaws—does not help BTA under the patent's broad definition of "dynamically."

\*  \*  \*

In sum, BTA's cache coherency arguments are both forfeited and meritless. BTA did not raise this argument below; PAN did not rely on Duvall's client-side implementation; a skilled artisan could and would have addressed any cache coherency issue in any event; and BTA ignores the broad meaning of "dynamically" set forth in its own patent. The Court should thus reject BTA's cache coherency arguments.

### 3. BTA mischaracterizes the Board's reliance on *ParkerVision*.

BTA also argues that the Board's analysis of the dynamic modification limitation rested on an "erroneous application" of this Court's *ParkerVision* decision. BBr. 34. BTA hangs its argument on a single sentence from the Board's

multi-page analysis of the "dynamically modifying" limitation—the statement that "Duvall's editing manager is at least reasonably capable of allowing dynamic modifications of an analysis capability as limitation 1.e requires, even if Duvall does not explicitly disclose such a capability." BBr. 34 (citing Appx62). BTA alleges that "the Board's conclusion is premised on the misunderstanding that the '641 Patent's dynamic modification limitation did not actually have to be disclosed by the prior art—but rather Duvall-Chu only had to be theoretically capable of being modified to perform this limitation." BBr. 35.

BTA misreads the Board's decision. The Board did not rely on any theoretical modification to the Duvall-Chu combination (or, indeed, even to Duvall alone). Rather, it relied on functionality *already present* in Duvall based on its use of "known commercial databases":

> Based on Duvall's disclosure that ties its editing manager database functionality to known commercial databases and evidence describing same, as Petitioner shows, *prior art databases, such as Duvall's, were not only at least capable of, but configured to, perform dynamic modification* via online editing where "techniques for solving this problem were well known in the art and already incorporated into commercially available database-management systems."

Appx58 (citing Appx3059–3060, emphasis added).

That analysis is entirely consistent with *ParkerVision*. That case held that "a prior art reference may anticipate or render obvious an apparatus claim . . . if the reference discloses an apparatus that is reasonably capable of operating so as to

meet the claim limitations." 903 F.3d at 1361. As the Board here explained, "the use of a standard commercially available database-management system at the time of the '641 patent would have enabled a database entry to be queried (i.e., read) while simultaneously being written to," which "prevents the filtering system from being down during updates." Appx58. As explained above, the Board reached this finding based on ample evidence and expert testimony.

The Board did not premise its finding on any modifications to Duvall's database-management system; it found that Duvall *already discloses* this functionality. Specifically, the use of "a standard commercially available database-management system" made Duvall's system both "capable of" and "configured to[] perform dynamic modification." Appx58. BTA's assertion that the Board's statement at Appx62 "stretches the 'reasonably capable' language" of *ParkerVision* to mean "'reasonably capable' of being modified," BBr. 33, thus ignores the Board's actual analysis. *See* Appx56–58; *cf. Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1346 (Fed. Cir. 2021) (rejecting appellant's argument that relied on "isolated, out-of-context statements plucked from dozens of pages" of the Board's analysis).

The additional cases cited by BTA do not help BTA either. BBr. 33–34 (citing *INVT SPE LLC v. ITC*, 46 F.4th 1361 (Fed. Cir. 2022); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201 (Fed. Cir. 2014); *Versata Software, Inc. v. SAP Am.,*

*Inc.*, 717 F.3d 1255 (Fed. Cir. 2013); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1354 (Fed. Cir. 2010)).[5] For one thing, each case discusses requirements for *infringement*, not obviousness. *See Ericsson*, 773 F.3d at 1217; *Versata*, 717 F.3d at 1263; *Finjan*, 626 F.3d at 1204; *INVT SPE*, 46 F.4th at 1376. Moreover, to the extent these cases stand for the proposition that "[a]n invalidating reference must contain some disclosure to indicate that the claimed functionality would be carried out by the prior art at least under some circumstances," BBr. 33, the Board found—citing ample record evidence—that Duvall would *actually carry out* the claimed dynamic modification. *Supra* Section I.B. Indeed, Duvall expressly discloses that its "filtering system detects when the client opens the data stream . . . and *searches the filter database* for matching filters." Appx865(4:40–43) (emphasis added).

Thus, as PAN explained and the Board found, "the analysis capability of said probe always reflects the latest and current set of filters" in the filter database. Appx55 (citing Appx390; Appx802(¶153)). That factual finding is supported by substantial evidence. And BTA's attempt to manufacture a legal error in the Board's analysis lacks merit.

---

[5] BTA's citation contains an error and likely is meant to refer to *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010).

**II.** **THE BOARD DID NOT ERR IN FINDING A MOTIVATION TO COMBINE.**

**A.** **The Board correctly determined that a skilled artisan would have combined Duvall and Chu.**

PAN's rationale for combining Duvall and Chu was straightforward. "Duvall discloses filtering techniques that include ALLOW filters, BLOCK filters, and deferred-action filters." Appx363. Duvall contemplates that data may not match any of these filters, in which case "the system may default to allowing or blocking the residue data." Appx367. A skilled artisan would have recognized that applying such a default action could make the system, as Duvall itself discloses, "filter[] too much or too little." Appx770(¶107) (citing Appx867(8:6–8); Appx367). That issue would have led a skilled artisan directly to Chu. Appx367. Rather than set a default block or allow action, Chu teaches prompting an actual human to resolve the unmatched data. Appx368–369.

As PAN explained, a skilled artisan "would have been motivated to incorporate Chu's user intervention into Duvall's system for data transmissions not matching any of Duvall's positive/negative filters at step 104 nor resolved by Duvall's post-filtering residue analysis" (that is, Duvall's deferred action analysis). Appx369. In Duvall's corporate environment, the person resolving unmatched data transmissions "would be a person trained in network administration and security" who could customize the filters if they are "filtering too much or too little." Appx370 (citing Appx867(8:5–7); Appx773–774(¶¶112–113)). And a skilled

42

artisan "would have understood that the person may also be part of a specialized third-party network-security service, rather than a corporate employee." Appx370 (citing Appx774(¶113); Appx1918).

The Board agreed. It credited Dr. Jeffay's testimony—supported by citations "to several prior art analyst systems"—that such systems would have been "advantageous" in Duvall. Appx42–44 (citing Appx795–796(¶142); Appx1918; Appx1935(1:49–60); Appx1958(2:16–20)); *see also* Appx47–48 (discussing Dr. Jeffay's testimony regarding use of "third-party security monitoring services") (citing Appx3084–3085(¶17); Appx4769–4770)). As the Board reasoned, "in addition to Duvall's 'password protected' 'editing manager' for editing filters by an analyst, Duvall also describes 'a corporate network' having 'a uniform set of filters for many users.'" Appx46. Read "in light of Chu's teaching of providing feedback about residue data to a human operator (analyst)," Duvall's disclosure suggests that "information about the residue data would be sent to an analyst system having trained professionals for handling the unresolved residue data." Appx46 (citing Appx386–387; Appx867(8:8–9, 8:18–23); Appx795–796(¶142).

Accordingly, the Board properly considered the prior art and record evidence in determining that a skilled artisan would have been motivated to combine Duvall and Chu. That finding is amply supported by the testimony of PAN's expert and the prior art itself.

43

### B.    BTA's contrary arguments fail.

BTA's scattershot challenges to the Board's motivation-to-combine determination fail. These arguments mischaracterize the factual record and ignore well-established principles of obviousness.

### 1.    PAN did not change its proposed motivation to combine Duvall and Chu.

BTA first argues that "PAN's own expert refuted PAN's purported motivation to combine during cross-examination," and in response, PAN "shifted gears" to a different motivation in reply. BBr. 43–44. Not so.

As already explained, PAN's petition argued that a skilled artisan "would have recognized [] that applying a default action of allow or block for residue data could lead to, as Duvall discloses, 'the filtering system … filtering too much or too little.'" Appx367(citing Appx867(8:6–8)). Incorporating "Chu's user intervention into Duvall's system" would "allow the user to make custom changes [to filters] if the user believes that the filtering system is filtering too much or too little." Appx369 (citing Appx867(8:6–8)). For example, if the user is made aware of an unmatched data transmission and determines that the data should be allowed or blocked, the user can update the filters accordingly. *See id.*

BTA argued in response that PAN's motivation was "undermined by the fact that Duvall explicitly discloses that a 'user [can] make custom changes' using the editing manager." Appx2395 (citing Appx867(8:6–7)). In other words, BTA

44

argued that, because Duvall already discloses a mechanism for editing filters, there is no need for Chu's techniques.

PAN addressed this misunderstanding in its reply, explaining that it was not "propos[ing] a new filter-editing mechanism in Duvall." Appx3045 (citing Appx367–371). Instead, incorporating human intervention—as taught by Chu— into Duvall would "improv[e] the process for determining when to edit filters." Appx369–370; Appx3045. That is, filters can be edited when the human determines whether unmatched data should be blocked or allowed.

As the Board recognized, that was the same theory proffered in PAN's petition. Appx49–50. PAN never shifted its proposed motivation to combine; PAN reiterated it in a manner that addressed BTA's mischaracterization of the petition. "[W]hether to block or allow residue data" and "when to edit filters," BBr. 44, are merely two aspects of the same motivation. *When* the user determines *whether* to block or allow a data transmission, the user is able to "make custom changes [to filters] if the user believes that the filtering system is filtering too much or too little." Appx867(8:6–8). BTA's focus on the "whether" versus "when" articulations of the motivation is pure semantics. Appx49–50.

BTA is also wrong that "PAN's own expert refuted PAN's purported motivation to combine during cross-examination." BBr. 44 (citing Appx2600, 133:10–22). First, BTA omits the premise of the question, which was focused on

Duvall's filter-editing mechanism (not human intervention): "Does Duvall recognize the need for any additional techniques to address the problem of filtering too much or too little *beyond the disclosed editing manager*?" Appx2600(133:10–13) (emphasis added). Dr. Jeffay's response was thus directed at whether another editing mechanism was needed, not whether Chu's human intervention techniques would be beneficial: "Duvall is disclosing is *a mechanism for updating [the] filter database*. And it's a very general purpose and generic mechanism. . . . *Duvall does not disclose that anything more than that is needed*." Appx2600(133:14–22) (emphasis added). In other words, Dr. Jeffay explained (correctly) that Duvall includes a generic mechanism for modifying its filters. That does not undermine the Board's finding that Chu's teaching of human intervention could be applied *in the specific case* where Duvall's default actions (which occur when data does not match a filter) may disadvantageously over- or under-filter unknown data.

Second, to the extent BTA is contending that PAN was required to identify a problem with Duvall's system to prove a motivation to combine, BTA is wrong on the law. This Court has squarely rejected the proposition that a motivation to combine is lacking merely because the prior art "already address[ed] the problem" at issue; indeed, a prior-art combination need not be "an 'improvement' in a categorical sense" as long as it is a "suitable option." *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380–81 (Fed. Cir. 2023); *accord Snap Inc. v. You*

46

*Map, Inc.*, 2025 WL 2793538, at *4 (Fed. Cir. Oct. 1, 2025). Implementation of

Chu's human intervention in the Duvall system was decidedly a "suitable option,"

as the Board found both in the final written decision and the decision on rehearing.

*See* Appx49–51; Appx141–142 (finding Dr. Jeffay's testimony "credible for

showing that the combined system of Chu and Duvall would have provided

benefits to Duvall's system").

Finally, BTA's reliance (at 41) on *ActiveVideo Networks, Inc. v. Verizon*

*Communications, Inc.,* 694 F.3d 1312 (Fed. Cir. 2012), is misplaced. There, the

Court found that an alleged motivation to "build something better" was insufficient

because it was "generic" and bore "no relation to any specific combination of prior

art elements." *Id.* at 1328. Here, in contrast, the motivation to combine Duvall and

Chu is specifically based upon Duvall's disclosed filtering process and Chu's

disclosure of human intervention in resolving unmatched data. Appx367–371.

> ## 2. BTA's contention that Chu's human intervention is "antithetical" to Duvall amounts to an improper bodily incorporation argument.

BTA's second argument—that "[t]he portion of Chu relied upon to justify

the proposed modification to Duvall is antithetical to the fundamental nature of

Duvall's system," BBr. 45–46—is likewise flawed.

BTA contends that "Chu teaches prompting an end-user," and that "giving

control over to the end-users of Duvall's system would be antithetical to its

purpose." BBr. 46. But PAN never proposed prompting end-users in the Duvall-Chu combination. Appx370; BBr. 46. Rather, PAN argued that, "[i]n Duvall's corporate environment, where a 'uniform set of filters for many users' is provided, . . . the person making the changes to these filters would be a person trained in network administration and security, not each individual employee at their own computer." Appx370 (citing Appx867(8:8–16); Appx773–774(¶112)). That is, PAN relied generally on Chu's teaching of human intervention to resolve unmatched data—not the particular user prompted in Chu's system. Appx369–370.

BTA's argument improperly assumes that the entirety of Chu—including its user—must be bodily incorporated into Duvall. That, of course, is wrong; PAN may rely on Chu's teachings without incorporating every aspect of Chu's system. *See Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016). "It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements." *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012)

BTA's additional case citations are likewise misplaced. For example, BTA relies on *Medtronic, Inc. v. Teleflex Innovations S.à.r.l.*, 69 F.4th 1341 (Fed. Cir. 2023), to argue "[i]t is error for the Board to ignore evidence that a proposed modification would interfere with a reference's stated purpose." BBr. 47. But

incorporating Chu's human intervention techniques would not defeat Duvall's stated purpose. It would further that purpose by preventing the filtering system from "filtering too much or too little." Appx369–370; Appx867(8:6–8).

More fundamentally, "[a] reference may be read for all that it teaches, including uses beyond its primary purpose." *Mouttet*, 686 F.3d at 1331; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007) (similar); *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800–801 (Fed. Cir. 2021) (intended purpose of the prior art "does not control"); *Medtronic*, 69 F.4th at 1349. Even if the combination of Duvall and Chu impeded some stated purpose of Duvall (it does not), that would not undermine the Board's finding that a skilled artisan would have combined the references to arrive *at the claimed invention*. As this Court recently put it, "[t]he inquiry is not whether a relevant artisan would combine a first reference's feature with a second reference's feature to meet requirements of the first reference that are not requirements of the claims at issue." *Axonics, Inc. v. Medtronic, Inc.*, 73 F.4th 950, 957 (Fed. Cir. 2023).

### 3. The Board was entitled to consider evidence of the state of the art in determining obviousness.

BTA also contends that the combination of Duvall-Chu "lacks support as neither Duvall nor Chu ever disclose any analysts or analyst systems." BBr. 48. The Board thoroughly addressed this argument, crediting PAN's expert that such

systems were "well-known" and that a skilled artisan would have been readily able "to implement them in other security monitoring systems such as Duvall-Chu." Appx43–48. That reasoning was both factually and legally sound.

Duvall, as the Board found, uses "a 'uniform set of filters for many users' for 'a corporate network,'" which "suggests that 'the decision of how to handle unresolved data would not be left to each user individually, but rather, to a group of people trained in making such decisions, such as analysts at a network-security service.'" Appx43 (citing Appx387; Appx867(8:18–23)). And the Board cited "several prior art analyst systems," like IBM's NetRanger service, that "would have been advantageous in Duvall's system." Appx44 (citing Appx1918; Appx1935(1:49–60); Appx1958(2:16–20)); Appx47 (citing Appx4770). Based on this evidence, the Board found that a skilled artisan would have "assign[ed] the role of managing and editing filters to a group of people having the expertise to properly evaluate whether 'the filtering system is filtering too much or too little'" (and therefore whether any changes to the automatic filters need to be made). Appx48 (citing Appx387; Appx867(8:6–8)). The skilled artisan would not have left that task to the individual receiving potentially unsafe content. *See id.*

To the extent these analyst systems are not expressly taught by Duvall, the Board was entitled to rely on background evidence of the state of the art in determining obviousness. PAN's obviousness grounds expressly included the

knowledge of a skilled artisan. *See, e.g.*, Appx370 (citing Appx774(¶113); Appx1918). And this Court's "case law has long recognized numerous permissible uses for general background knowledge in an IPR such as, for example, furnishing a motivation to combine, or supplying a missing claim limitation." *Shockwave Med., Inc. v. Cardiovascular Sys., Inc.*, 142 F.4th 1371, 1378–79 (Fed. Cir. 2025); *accord KSR*, 550 U.S. at 418 (obviousness inquiry must account for "background knowledge possessed by a person having ordinary skill in the art"); *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). So, to the extent the Board relied on evidence outside of Duvall and Chu in finding that analyst systems were obvious, that was entirely permissible. Indeed, it would have been error for the Board *not* to have considered this undisputed evidence about the background knowledge a skilled artisan would have brought to the table. *See KSR*, 550 U.S. at 418.

### 4. The Board did not use improper hindsight.

BTA—largely repeating its previous arguments—contends that, "absent improper hindsight, there would be no reason" to combine Duvall with Chu. BBr. 49–52. Quite the contrary. As explained above, the Board's decision was grounded in Duvall's and Chu's disclosures: Chu's teaching of human intervention to resolve unmatched data furthers Duvall's stated goal of preventing its filtering system from "filtering too much or too little" in a corporate environment. Appx43–48; Appx867(8:6–8, 8:18–23); *supra* Section II.B.2. As also explained above, the

51

Board's reliance on background knowledge in the art was proper under black-letter obviousness precedent. *Supra* Section II.B.3.

BTA's contention that the proposed combination would "result in an inoperable system" because "the browsing session of the end-users must be put on hold until each prompt is responded to for *each* data transmission," BBr. 51, is similarly unavailing. For one thing, BTA never argued to the Board that the combination of Duvall and Chu would result in an inoperable system. *See* Appx2380–Appx2424. This argument is thus forfeited. *In re Baxter*, 678 F.3d 1357, 1362 (Fed. Cir. 2012).

The argument is also wrong. To the extent any data transmissions are put on hold, they would be the small percentage that do not meet any of Duvall's immediate or deferred action filters. *See* Appx369. And such a process furthers Duvall's goal of not "filtering too much or too little" in a corporate environment. Appx43–48; Appx867(8:6–8, 8:18–23). Moreover, that a human may take time to resolve potentially malicious transmissions does not make Duvall-Chu's system inoperable. Indeed, using Duvall's default block filter would similarly prevent the end-user from sending or receiving a data transmission. Appx866(5:1–6).

In short, BTA's hindsight argument fails to consider the Board's detailed analysis of the actual combination and supporting evidence presented by PAN. Appx42–51. It should be rejected.

### 5. The system of Duvall-Chu is not rendered inoperable based on the volume of data sent to a human analyst.

BTA's last argument on motivation to combine again asserts that the Duvall-Chu system would be "effectively inoperable . . . given the volume of data that the [human] would need to manage." BBr. 52–53. As noted above, BTA forfeited this argument by failing to raise it in its IPR papers.

Regardless, BTA's interpretation of the Duvall-Chu combination is incorrect. BTA argues that "Duvall's system effectively sends *all* residue to an analyst," and "this type of solution—i.e., just sending all the indeterminate data to a human—is the very thing contemplated and rejected by the specification of the '641 Patent." BBr. 53, 53 n.7. But that contention ignores Duvall's deferred-action filters, which *prevent* the system from indeterminately sending all residue data to a human analyst.

Specifically, "data transmissions that do not match the immediate action ALLOW or BLOCK filters in step 104 *(i.e., the residue data) are further analyzed by the system in 'deferred filters,'* as shown by the example in FIG. 4 of Duvall." Appx365 (citing Appx866(5:8–29); Appx860(FIG. 4); Appx768–769(¶105)) (emphasis added). This analysis step happens after positive and negative filtering. Only residue data not matching Duvall's positive and negative filters *and also* its deferred-action filters would be sent to a human for further analysis. Appx369.

Duvall's deferred-action filters serve the same function as the anomaly engine described in the '641 patent, which "determines what residue information may be worthy of additional analysis and sends such information . . . to the SOC." Appx167(8:55–62).

BTA's argument is also untethered from the claim language. The claims do not require any particular "volume of data" that "would need to [be] manage[d]." *Contra* BBr. 53. BTA cannot attack the combination based on unclaimed features. *See Axonics*, 73 F.4th at 957. And, in any event, the proposed combination is not premised on a single "analyst," as BTA suggests. BBr. 54–55. Rather, the combination employs a "group of people having the expertise to properly evaluate whether 'the filtering system is filtering too much or too little.'" Appx48 (citing Appx387; Appx867(8:6–8)). Even if a large volume of data were transmitted for human analysis, the data would be divided among a group of analysts—meaning the burden on any one person would be manageable. Indeed, the '641 patent itself acknowledges that such analyst systems are useful precisely because system administrators "do not have the time or ability to read through large amounts of constantly updated audit information." Appx164(1:36–50).

At bottom, BTA's inoperability arguments ignore the actual operation of PAN's combination and defy the claim language to boot. They should be rejected.

### III. THE BOARD DID NOT ERR IN FINDING CLAIM 6 OBVIOUS.

Claim 6 requires that "the multi-stage analysis" of claim 2 "includes analysis at the probe and analysis at a secure operations center configured to receive data from the probe." Appx180(33:54–56). BTA argues that the Board erred with respect to claim 6 because "the Board never identifie[d] any sort of analysis by Duvall-Chu that occurs at a SOC in the 'identifying step.'" BBr. 55 (citing Appx81–87). BTA's argument fails for two reasons. *First*, the claims do not require the analysis and identification of limitation 1.b to be completed before the information transmission of limitation 1.c begins. *Second*, even if the claims did impose an ordering requirement, PAN's combination included two analyst systems that satisfy the claims under such an interpretation.

A. As the Board recognized in addressing claim 6, "Duvall's 'multi-stage analysis includes analysis at the probe and at a secure operations center,' including evaluating status data in multiple stages." Appx86 (citing Appx392). And the Board determined that "the combined system of Duvall-Chu flags (identifies) unresolved residue data processed *during limitation 1.b per the multi-stage analysis of claim 6 at the probe and SOC for further analysis* and then sends information about that identified residue data from the SOC to the corporation during limitation 1.c." Appx150 (citing Appx392–394; Appx50–51; Appx81–87).

Thus, the Board expressly identified analysis at the SOC in the system of Duvall-Chu that occurs during the "identifying step" of limitation 1.b. *Id.*

No more is required to satisfy the additional requirements of claim 6. As the Board found, claim 6 does not "preclude[] performing functions that may satisfy limitation 1.c during the analysis of limitation 1.b." Appx150. And nowhere does claim 1 specify that the identification of "potentially security-related events" must end before any information is communicated to the recited "analyst system." Appx33:31–38; Appx3060–3061 (petitioner reply); *see Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) ("Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one."); *Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1306 (Fed. Cir. 2015) (even claims that "require order" do not necessarily require discrete steps and may permit starting subsequent steps before finishing prior ones).[6]

The Board thus correctly found that "information flows 'from the probe to the SOC, and from the SOC to the probe' . . . during limitation 1.b." Appx150. And Duvall-Chu's "iterative process" "performs dependent claim 6 per limitation 1.b's requirements before the Duvall-Chu system performs limitation 1.c's

---

[6] Imposing a strict ordering requirement on claim 1 would be all the more illogical given that the claim covers a system, not a method.

requirements"—even if that process "also performs at least some aspects that may otherwise satisfy limitation 1.c during the analysis of limitation 1.b." Appx150–151 (citing Appx392–394).

B.     Even if strict ordering of limitations 1.b and 1.c were required, the Duvall-Chu system still satisfies claim 6 because Duvall-Chu includes an "analyst system" system at *both* the probe and the SOC. Appx86; Appx87 n.17. BTA contends that the "'analyst system' from the FWD's mapping of Claim 1 is Duvall's editing manager," and "the FWD never explains how that 'editing manager' ever performs any analysis as part of Limitation 1.b." BBr. 56. But this argument conflates the analysis performed at the "analyst system" of limitation 1.c with the analysis performed at the "secure operations center" of claim 6. *See* Appx180(33:46–47, 33:54–56). As the Board recognized, PAN's Duvall-Chu combination includes *two* analyst systems: the analyst system for updating the filters at the probe, satisfying claim 1, and an analyst system at the SOC that can take part in the multi-stage analysis, satisfying claim 6. *See* Appx86; Appx87 n.17.

The Board's mapping and conclusion are supported by substantial evidence. As PAN's petition explained, "Duvall discloses that its filtering system can 'be incorporated into a firewall [or] gateway,'" and a skilled artisan "would have recognized that accessing a firewall or gateway can be, and most typically is, accessed remotely, e.g., from a separate 'network operations center.'" Appx393

(citing Appx864(1:60–64); Appx1918; Appx807(¶171)). Duvall also discloses "that the filtering system is accessed through an 'editing manager' that is 'preferably password protected,'" which would be accessed by analysts "located remotely . . . in their 'secure operations center.'" Appx393–394 (citing Appx867(8:2–9, 8:21–23); Appx807–809(¶¶171–172)); Appx84 (citing same). Thus, in Duvall-Chu, "an analyst system [at the SOC] would receive residue data [at the probe], evaluate that data, update the respective filters [thereby identifying events in limitation 1.b], and *provide those updates to the corporation [which includes the analyst system at the probe]* per the terms of the subscription [i.e., *thereby transmitting information at limitation 1.c*]." Appx86 (quoting Appx394) (emphasis added, bracketed clarifications the Board's).

The Board's analysis of claim 6 matches the operation described in the '641 patent. BTA's own description of the patent makes this clear: "[t]he probe analyzes the leftover indeterminate status data (the residue) to identify events rising to the level of a potential security-related event, *and then sends information about what was identified to analyst systems located at the SOC for the second-level analysis (to confirm whether they are actual security events)*." BBr. 7 (emphasis added). And, "[o]nce that second analysis at the SOC is complete, *the system provides feedback from the SOC to the probe* where resource coordinator 2060 updates software at the probe, dynamically." BBr. 13 (emphasis added). That is precisely

the operation in Duvall-Chu that the Board relies on for its obviousness conclusion. The '641 patent does not describe a third-level analysis at the SOC. Nor would it make sense for the SOC to, after receiving information from the probe, "transmit information about the identified events" to itself. Appx87 n.17.[7]

\* \* \*

The Board's finding that claim 6 would have been obvious is supported by substantial evidence and should be affirmed.

## IV. THE BOARD DID NOT LACK JURISDICTION OVER THE '641 PATENT.

BTA asserts that "the Board has no jurisdiction over the expired '641 patent in an IPR, and the judgment adverse to patentability must be vacated." BBr. 60. BTA acknowledges that its argument is foreclosed by this Court's precedent. BBr. 59; *Apple*, 127 F.4th at 368–69 (holding that "the Board has jurisdiction over IPRs concerning expired patents"). Moreover, BTA's analysis is limited to a bare assertion that expired patents "fall outside the scope of the public-rights doctrine" because "what remains for expired patents are only private rights." BBr. 59–60.

---

[7] BTA alleges that "Claim 6 adds another layer of computerized analysis for the post-filtering residue at a SOC, prior to sending identified events to the analyst for further review." BBr. 7. Nowhere does the '641 patent describe this operation, nor does BTA provide any supporting citation. Moreover, limitation 1.c requires "transmit[ting] information about the identified events to an analyst *system*"—not to an analyst. Appx180(33:36–38). Therefore, BTA's interpretation would run into the same "anomalous outcome" that the Board already rejected, requiring the recited "analyst system" to somehow transmit information to itself. Appx87 n.17.

That "conclusory assertion with no analysis is insufficient to preserve the issue for appeal." *Trading Techs.*, 921 F.3d at 1385 (declining to address constitutional arguments where appellant raised them "[i]n a total of four sentences in its opening brief"). This argument—in addition to failing on the merits—is thus forfeited.

## CONCLUSION

The Court should affirm.


Dated: October 8, 2025

Respectfully submitted,

*/s/ William H. Milliken*

William H. Milliken
Michael D. Specht
Daniel S. Block
Jonathan Tuminaro
Steven M. Pappas
STERNE KESSLER GOLDSTEIN &
  FOX PLLC
1101 K Street, NW
Floor 10
Washington, DC 20005
(202) 371-2600

*Counsel for Appellee*
*Palo Alto Networks, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2025-1572

**Short Case Caption:**  BT Americas, Inc. v. Palo Alto Networks, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑     the filing has been prepared using a proportionally-spaced typeface and includes  12,848  words.

☐     the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐     the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 10/08/2025

Signature:  /s/ William H. Milliken

Name:  William H. Milliken

Save for Filing